IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

WORLDWIDE NETWORK SERVICES, LLC,    )
                                    )
and                                 )
                                    )
WORLDWIDE NETWORK SERVICES          )
   INTERNATIONAL, FZCO              )
                                    )
          Plaintiffs,               )
                                    )
v.                                  )    ACTION NO. 1:07cv627
                                    )
DYNCORP INTERNATIONAL, LLC,         )
                                    )
                                    )
          Defendant.                )

**MEMORANDUM ORDER**

THIS MATTER is before the Court on Defendant DynCorp
International, LLC's Renewed Motion for Judgment as a Matter of Law,
Motion to Alter or Amend Judgment, and Motion for a New Trial [Doc.
No. 427].  This case involves claims of discriminatory contract
termination, breach of contract, breach of the covenant of good
faith and fair dealing, tortious interference with contract and
prospective economic advantage, and conspiracy.  This case was tried
by a jury in April and May 2008.  At the close of all the evidence,
the Court granted Plaintiffs Worldwide Network Services, LLC's
("WWNS") and Worldwide Network Services International FZCO's ("WWNS
FZCO") Renewed Motion for Judgment as a Matter of Law pursuant to
Federal Rule of Civil Procedure 50(a) with respect to certain unpaid

invoices.[1] (*See* Order granting Plaintiffs' Renewed Rule 50 Motion,

1:07cv627 Doc. No. 399, May 12, 2008.)   After several days of

deliberation, the jury returned a split verdict, finding in favor of

Plaintiffs WWNS and WWNS FZCO on Count I (Section 1981

Discrimination in Contracting), Count III (Tortious Interference

with Employment Contract), Count VII (Breach of the CivPol

Subcontract), Count VIII (Breach of the WPPS Subcontract), Count IX

(Breach of the Implied Duty of Good Faith and Fair Dealing), and two

of DynCorp's counterclaims.   The jury found in favor of DynCorp on

Count IV (Tortious Interference with Prospective Economic

Advantage), Count V (Common Law Civil Conspiracy), Count VI

(Virginia Statutory Conspiracy) and its breach of the WPPS

subcontract counterclaim.   The jury awarded DynCorp $178,000.00 in

compensatory damages on the breach of the WPPS subcontract

counterclaim.   Additionally, the jury awarded WWNS ten million

dollars in punitive damages.

DynCorp's Renewed Motion for Judgment as a Matter of Law,

Motion to Alter or Amend Judgment, and Motion for a New Trial

presents nine issues to the Court for resolution.   First, whether

the Court erroneously denied DynCorp's Motion for Judgment as a

Matter of Law with respect to the Section 1981 discrimination in

contracting claim by refusing to apply *Hill v. Lockheed Martin*

---

[1]The Court subsequently amended its Rule 50 Judgment upon
DynCorp's Motion for Reconsideration. (*See* Amended Order granting
Plaintiff's Renewed Rule 50 Motion, 1:07cv627 Doc. No. 414, June
17, 2008.)

*Logistics Mgmt., Inc.*, 354 F.3d 277 (2004).  Second, whether the Court erroneously denied DynCorp's Motion for Judgment as a Matter of Law with respect to the tortious interference with contract claim.  Third, whether the Court's refusal to give a jury instruction based on the holding in *Hill* warrants a new trial. Fourth, whether the admission of certain testimony in the wake of the Court's refusal to give a jury instruction based on the holding in *Hill* was unduly prejudicial such that DynCorp was deprived of a fair trial.  Fifth, whether the exclusion of the testimony of DynCorp expert witnesses Christopher Kellogg and Ronald Scott Merriman, along with the exclusion of two reports authored by Mr. Kellogg warrants a new trial.  Sixth, whether the Court's decision to exclude evidence of WWNS's destruction of certain documents in Iraq constitutes an error of law that requires a new trial. Seventh, whether the Court erred in preparing a verdict form that allowed the jury to award WWNS FZCO damages on all claims asserted by WWNS, not just the tortious interference with contract claim, such that DynCorp is entitled to a new trial.  Eighth, whether the Court erroneously granted WWNS's Motion for Judgment as a Matter of Law with respect to certain unpaid invoices.  And finally, whether the Court should vacate or remit the jury's ten million dollar punitive damages award.

The Court denies Defendant DynCorp International, LLC's Renewed Motion for Judgment as a Matter of Law, Motion to Alter or Amend Judgment, and Motion for a New Trial for the following reasons.

-3-

First, the Court DynCorp's denies Renewed Motion for Judgment as a Matter of Law on the Section 1981 claim because, irregardless of the application of *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (4th Cir. 2004), the evidence presented at trial created a question of fact for the jury as to which DynCorp official(s) was the decisionmaker and a reasonable jury could, after weighing the evidence produced by both parties, reject DynCorp's evidence that Mr. Cashon was the sole decisionmaker and that his decision to terminate DynCorp's contractual relationship with WWNS was based on WWNS's poor performance was mendacity, and infer from the believed falsehood that DynCorp's rationale was nothing more than mere pretext for its intentional discrimination. Second, the Court denies DynCorp's Renewed Motion for Judgment as a Matter of Law on the tortious interference with contract claim because evidence exists in the record upon which a reasonable jury could return a verdict in favor of WWNS and WWNS FZCO. Third, the Court denies DynCorp's Motion for a New Trial with respect to its claim that the Court erroneously refused to give a jury instruction based on the holding in *Hill* because DynCorp has not demonstrated that *Hill* was a correct statement of the law in Section 1981 cases, that imputation of an employee's racial animus to DynCorp was not covered by another instruction, or that the Court's refusal seriously impaired DynCorp's ability to conduct a defense. Fourth, the Court denies DynCorp's Motion for a New Trial with respect to its assertion that the Court erroneously admitted certain testimony regarding the

-4-

racial animus of non-decisionmakers at DynCorp because the Court did not error in refusing to give a jury instruction based on the holding in *Hill*.   Fifth, the Court denies DynCorp's Motion for a New Trial based on the Court's exclusion of the testimony of Messrs. Kellogg and Merriman and the two reports authored by Mr. Kellogg because Messrs. Kellogg and Merriman were undisclosed expert witnesses whose testimony was cumulative, and the reports constitute expert evidence, improperly designated, which contain hearsay. Sixth, the Court denies DynCorp's Motion for a New Trial with respect to its claim that the Court erroneously excluded evidence of WWNS's document destruction because the destroyed evidence was immaterial.   Seventh, the Court denies DynCorp's Motion for a New Trial with respect to its contention that the Court erred in preparing a verdict form that allowed the jury to award damages to WWNS FZCO on claims other than tortious interference with contract because DynCorp failed to raise this issue during trial and no such limitation was placed on WWNS FZCO's joinder.   Eighth, the Court denies DynCorp's Motion to Alter or Amend the Court's Grant of Plaintiffs's Rule 50(a) motion regarding certain unpaid invoices because the subcontracts did not provide DynCorp with the right to withhold the processing of invoices remitted for payment indefinitely.   Finally, the Court denies DynCorp's motion to vacate or remit the ten million dollar punitive damages award because the record demonstrates that DynCorp's conduct towards WWNS was malicious and the single-digit ratio between the compensatory award

and the punitive damage award is within the constitutional limits of due process.

## I. BACKGROUND

The facts of this case are too voluminous to recite in depth, and only those facts which provide context for the nature of the dispute between the parties are recited below.  Plaintiff Worldwide Network Services, a firm certified by the Small Business Administration as an 8(a) small disadvantaged company, was awarded a subcontract with Defendant DynCorp International, LLC to perform communications related work for DynCorp's civil police ("CivPol") and Worldwide Personal Protective Services ("WPPS") contracts with the United States Department of State in Iraq and Afghanistan after WWNS's principals Reginald Bailey and Walter Gray met DynCorp's President and Chief Executive Officer Steven Cannon.  Ross Perot, a well known entrepreneur had referred Mr. Bailey and Mr. Gray to Mr. Cannon.  In March 2006 WWNS created Plaintiff Worldwide Network Services International, WWNS FZCO for tax purposes and instructed its employees working on the DynCorp subcontracts in Iraq and Afghanistan to sign employment contracts with WWNS FZCO.  WWNS continued to act in all material respects as the employer of WWNS FZCO's employees: WWNS paid the employees' salaries, procured the work contracts, and employed the human resource director who interacted with the employees on a daily basis.

Initially, DynCorp was pleased with the work WWNS completed on the two subcontracts in Iraq and Afghanistan.  DynCorp's Vice

-6-

President of the CivPol initiative, Richard Cashon, gave WWNS positive performance evaluations, praising WWNS's work as "EXCEPTIONAL" and "VERY GOOD." However, in the fall of 2005 the relationship between DynCorp and WWNS began to cool. DynCorp hired Bob Rosenkranz as President of International Technical Services in the mid-fall of 2005, who in turn hired Richard Walsh as his Vice President of Operations. Walter Merrick, DynCorp's CivPol Program Manager also began working for DynCorp in late 2005 as did Mr. Merrick's IT manager, Leon DeBeer. WWNS employees began to observe displays of racial animus towards WWNS in the form of derogatory comments, such as Leon DeBeer referring to WWNS as "kaffirs,"[2] as well as deliberate exclusion from planning meetings, failing to respond to e-mail requests for information and assistance sent by Mr. Charles Jones and Mr. Ben Posil, WWNS's manager in Iraq, to Mr. DeBeer, and failing to renew/provide WWNS employees with the proper security badges WWNS's employees were required to have in order to perform their work and to access remote work sites. Additionally, DynCorp's evaluations of WWNS's performance turned critical. On July 17, 2006, Steven Cannon, the man responsible for DynCorp subcontracting with WWNS, resigned. Immediately thereafter, DynCorp terminated its relationship with WWNS.

Prior to making the decision to terminate its relationship with

---

[2]A "kaffir" is a "South African of negroid ancestry." *Webster's Third New International Dictionary* 1230 (1993). The term is usually used disparagingly. *Id.*

-7-

WWNS, DynCorp, along with EDO Corporation, the company DynCorp selected to replace WWNS, began soliciting certain WWNS employees on the ground in Iraq and Afghanistan for employment with EDO Corporation and DynCorp.  Richard Walsh also issued a directive to the accounting department to stop making or processing payments of WWNS's invoices.  DynCorp's decision to terminate its relationship with WWNS, its solicitation and hiring of WWNS's employees while WWNS' employees were working on the subcontracts, and DynCorp's deliberate withholding of payment for WWNS's unpaid invoices effectively put WWNS and WWNS FZCO out of business;[3] the CivPol and WPPS subcontracts comprised more than 95 percent of WWNS and WWNS FZCO's business, and WWNS and WWNS FZCO were left with few employees and no money to compete for other contracts in the region.

DynCorp's malicious intentions toward WWNS were manifested in numerous ways.  First, DynCorp began to identify WWNS employees that it would recruit to work on the CivPol contract while they were employed with WWNS.  Second, Mr. Walsh made the unilateral decision to stop processing and paying WWNS's invoices without providing WWNS with its contractual right of notice and an opportunity to cure any perceived deficiencies in the work.  Third, DynCorp refused to pay outstanding invoices at the end of the contract that had not been formally "rejected" knowing that WWNS was dependent upon DynCorp's

---

[3]Two months before trial in February 2008, DynCorp paid WWNS over $3.3 million dollars for outstanding invoices that dated back two years.  DynCorp offered no explanation for why it took two years to process those invoices.

-8-

revenue in order for it to continue to meet its obligations to its employees.   Fourth, Mr. Walsh's racial animus against WWNS and WWNS's owners was evident post termination at an October 2006 company dinner in Tyson's Corner, Virginia, where Mr. Walsh was celebrated as the person who "took down" WWNS.   Mr. Walsh received a t-shirt that stated, "I Took Down WWNS and all I got was this Lousy T-Shirt."   Mr. Walsh was also the recipient of a letter purporting to be from WWNS President Walter Gray, an African American.   The letter, read aloud to imitate Mr. Gray, was read in Ebonics, like the character on Fat Albert.

WWNS subsequently initiated this action.   In its Amended Complaint, WWNS asserted claims of discriminatory contract termination in violation of 42 U.S.C. § 1981, defamation, tortious interference with contract, tortious interference with prospective economic advantage, civil and statutory conspiracy, breach of contract, and breach of the covenant of good faith and fair dealing against DynCorp.   WWNS also asserted claims of defamation, tortious interference with contract, tortious interference with prospective economic advantage, and civil and statutory conspiracy against EDO Corporation.   DynCorp counterclaimed against WWNS and asserted claims of breach of contract, breach of price warranty, and breach of warranty for supplies/services.

The Court dismissed WWNS's defamation and tortious interference with prospective business advantage claims against EDO Corporation in September 2007.   In March 2008, the Court granted DynCorp's

-9-

Motion for Summary Judgment with respect to WWNS's defamation claim, denied EDO Corporation's Motion for Summary Judgment, and granted WWNS's Motion for Partial Summary Judgment with respect to DynCorp's breach of price warranty counterclaim.   The Court also ordered WWNS to join WWNS FZCO as a party Plaintiff.   WWNS FZCO was joined as a Plaintiff in this action March 13, 2008.   (*See* Order granting Motion for Joinder, 1:07cv627 Doc. No. 223, March 13, 2008.)

On the eve of trial, Plaintiffs WWNS and WWNS FZCO reached a settlement agreement with Defendant EDO Corporation, and the case proceeded to be tried by jury against Defendant DynCorp.   At the close of all the evidence, each party moved for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(a).   The Court denied DynCorp's Rule 50(a) motion, and granted WWNS's Rule 50(a) motion with respect to certain unpaid invoices that were still pending approval nearly two years after having been submitted for payment.   The remaining unpaid invoices, which DynCorp had rejected for payment, were submitted to the jury along with the rest of the case.

The jury returned a verdict in favor of Plaintiffs WWNS and WWNS FZCO on Count I (Section 1981 Discrimination in Contracting), awarding $3.42 million dollars in compensatory damages, Count III (Tortious Interference with Employment Contract), awarding $83,000 in compensatory damages, Count VII (Breach of the CivPol Subcontract), awarding a total of $895,495.43 in compensatory damages, Count VIII (Breach of the WPPS Subcontract), awarding a

-10-

total of $84,185.24 in compensatory damages, and Count IX (Breach of the Implied Duty of Good Faith and Fair Dealing), awarding $720,000 in compensatory damages.   The jury returned a verdict in favor of WWNS and WWNS FZCO on two of DynCorp's three counterclaims: Breach of CivPol Subcontract Counterclaim and Breach of Warranty of Supplies/Services Counterclaim.   The jury awarded WWNS prejudgment interest on the Section 1981 Discrimination in Contracting and breach of the CivPol and WPPS subcontract compensatory damages awards.   The jury returned a verdict in favor of Defendant DynCorp on Count IV (Tortious Interference with Prospective Economic Advantage), Count V (Common Law Civil Conspiracy), Count VI (Virginia Business Conspiracy), and DynCorp's Breach of WPPS Subcontract Counterclaim, awarding $175,000 in compensatory damages as well as prejudgment interest.   Additionally, the jury awarded WWNS ten million dollars in punitive damages.

DynCorp now moves this Court pursuant to Rule 50(b) to enter judgment as a matter of law in its favor with respect to (1) the tortious interference with contract claim, (2) the certain unpaid invoices WWNS submitted to DynCorp for payment still pending DynCorp's review and (3) the section 1981 discrimination in contract claim.   DynCorp also moves the Court to order a new trial pursuant to Rule 59(a) for its refusal to give a jury instruction based on *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (2004) and its ruling permitting the testimony of certain witnesses.

Finally, DynCorp moves the Court to vacate or remit the jury's punitive damage award.

## II.   DISCUSSION

### A.   Standard of Review

#### 1.   Federal Rule of Civil Procedure 50(b)

Federal Rule of Civil Procedure 50(b) allows parties to renew a motion for judgment after trial, or in the alternative to seek a motion for a new trial. FED. R. CIV. P. 50(b). The moving party must first make a motion for judgment as a matter of law prior to the case being submitted to the jury. *See* FED. R. CIV. P. 50 (a)-(b). The Court must enter judgment as a matter of law if "a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the nonmoving party would necessarily be based upon speculation and conjecture . . . ." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005)(citing *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 160 (4th Cir. 1988)). If, however, the evidence is susceptible to more than one "reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied." *See Myrick*, 395 F.3d at 490 (citing *Hofherr v. Dart Indus. Inc.*, 853 F.2d 259, 261-62 (4th Cir. 1988)). The jury verdict must stand "[i]f there is evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Lovell v. BBNT Solutions, LLC*, 295 F. Supp. 2d 611, 617-18 (E.D. Va. 2003). In making this determination,

-12-

the Court must review the evidence in the light most favorable to
the nonmoving party. *See Myrick*, 395 F.3d at 490.  The district
court may not substitute its judgment for that of the jury or make
credibility determinations. *Price v. City of Charlotte, N.C.*, 93
F.3d 1241, 1249-50 (4th Cir. 1996).  While the district court is
compelled to accord the utmost respect to jury verdicts and tread
gingerly in reviewing them, the court will not rubber stamp the
conclusions of the jury, but rather has a duty to reverse the jury
verdict if the evidence cannot support it.  *Id*.

##   2.   Federal Rule of Civil Procedure 59(a)

The standard governing motions for a new trial pursuant to
Federal Rule of Civil Procedure 59(a) is significantly different
from that governing motions for judgment as a matter of law.
*Lovell*, 295 F. Supp. 2d at 618.  On a Rule 59 motion, a district
court may set aside the jury's verdict and grant a new trial only if
"(1) the verdict is against the clear weight of the evidence, or (2)
is based upon evidence which is false, or (3) will result in a
miscarriage of justice, even though there may be substantial
evidence which would prevent the direction of a verdict." *Id*.
(citing *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*,
99 F.3d 587, 594 (4th Cir. 1996)).  On a motion for a new trial
addressing compensatory damages, the trial court must weigh the
evidence and consider the credibility of the witnesses to determine
whether the verdict was against the clear weight of the evidence or
was based upon evidence that was false. *Knussman v. Maryland*, 272

-13-

F.3d 625, 647 (4th Cir. 2001). If the trial court weighs the
evidence and determines that it is deficient to sustain a verdict,
then the trial court can set aside the verdict and grant a new
trial. *Id.* The grant or denial of a motion for a new trial is
entrusted to the sound discretion of the district court and will be
reversed on appeal only upon a showing of abuse of discretion.
*Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998).

### 3.   Federal Rule of Civil Procedure 59(e)

The Fourth Circuit recognizes three grounds that justify
altering or amended a judgment under Federal Rule of Civil Procedure
59(e): (1) to accommodate an intervening change in the law; (2) to
account for new evidence not available at the time of trial; and (3)
to correct a clear error of law or prevent manifest injustice. *U.S.
ex rel Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290
(4th Cir. 2002) (citing *Pacific Ins. Co. v. American Nat. Fire Ins.
Co.*, 148 F.3d 396, 403 (4th Cir. 1998)). The grant or denial of a
motion to alter or amend judgment under Rule 59(e) will be reversed
only for an abuse of discretion. *Pacific Ins. Co.*, 148 F.3d at 402.

### 4.   Remittitur

"There is no specific provision for remittitur under the
Federal Rules of Civil Procedure, but it is well established that a
remittitur should be ordered when a jury award will result in a
miscarriage of justice." *Bennett v. Fairfax County*, 432 F. Supp. 2d
596, 599 (E.D. Va. 2006) (citing *Cline*, 144 F.3d at 305). Under the

-14-

practice of remittitur, the trial court orders a new trial if it concludes the verdict is excessive unless the plaintiff accepts a reduction in the damage award. *Cline*, 144 F.3d at 305.  The decision as to whether damages are excessive is "entrusted to the sound discretion of the district court." *Robles v. Prince George's County, Maryland*, 302 F.3d 262, 271 (4th Cir. 2002).

**B.   Analysis**

### 1.   Renewed Motion for Judgment as a Matter of Law

#### a.   Application of Hill v. Lockheed Martin *to Section 1981 Discrimination in Contracting Claim*

The Court denies DynCorp's Renewed Motion for Judgment as a Matter of Law because, irregardless of the application of *Hill v. Lockheed Martin*, the evidence presented at trial created a question of fact for the jury and a reasonable jury could, after weighing the evidence produced by both parties, reject DynCorp's evidence that Mr. Cashon was the sole decisionmaker and that his decision to terminate DynCorp's contractual relationship with WWNS was based on WWNS's poor performance as mendacity, and infer from the believed falsehood that DynCorp's rationale was nothing more than mere pretext for its intentional discrimination.

DynCorp argues that the Court improperly failed to apply the standard articulated in *Hill* for determining whether racial motivation of a corporation's employees can be imputed to the corporation for purposes of determining whether a particular decision was racially motivated when it considered and ruled upon

-15-

its Motion for Judgment as a Matter of Law.  DynCorp asserts that it

is entitled to judgment as a matter of law under Federal Rule of

Civil Procedure 50(b) because WWNS produced no evidence that Mr.

Cashon was racially motivated to terminate WWNS.   The Court

disagrees.

> The Court of Appeals for the Fourth Circuit held in *Hill* that:
>
>> [i]n sum, to survive summary judgment, an aggrieved
>> employee who rests a discrimination claim under
>> <u>Title VII or the ADEA</u> upon the discriminatory
>> motivations of a subordinate employee must come
>> forward with sufficient evidence that the
>> subordinate employee possessed such authority as to
>> be viewed as the one principally responsible for the
>> decision or the actual decisionmaker for the
>> employer.

*Hill*, 354 F.2d at 291 (emphasis added).  As an initial matter, the

Court notes that throughout the *Hill* opinion, the Fourth Circuit is

painstakingly careful to limit its holding to "employer liability

under Title VII and the ADEA,"*id.* at 289, and DynCorp cites to no

case that extends *Hill*'s holding beyond claims brought under those

two Acts.   Instead, DynCorp asserts that the Court must apply *Hill's*

holding in this instance because courts have held that Section 1981

should be interpreted consistently with the standards applied under

Title VII and the ADEA.

The Court acknowledges that the burden-shifting scheme of

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is routinely

applied to actions brought under Section 1981 that are predicated on

indirect evidence.  *See e.g.*, *Davis v. Am. Soc'y of Civil Engineers*,

330 F. Supp. 2d 647, 655 (E.D. Va. 2004).  However, this fact,

-16-

standing alone, does not support DynCorp's position that Section 1981 claims should be treated exactly the same as claims brought under Title VII and the ADEA.  Section 1981 deals with racial discrimination in the making or enforcement of contracts, whereas Title VII and the ADEA deal with discrimination in employment. Plaintiffs pursuing claims under Title VII or the ADEA are subject to stricter scrutiny than those pursuing claims under Section 1981 because Title VII and ADEA actions must first proceed through the EEOC process.  Moreover, Title VII does not permit a general award of punitive damages, whereas Section 1981 specifically provides for such a remedy.  These differences between employment discrimination claims and contract discrimination claims demonstrate that, although similar, Title VII and Section 1981 are two distinct causes of action and the standards governing Title VII do not always apply to Section 1981 claims.  Given the Fourth Circuit's explicit language limiting its analysis in *Hill* to actions brought under Title VII and the ADEA, DynCorp's inability to point to a single case that extends *Hill's* holding beyond Title VII and ADEA claims, and the difference between the remedies offered by Title VII and Section 1981, the Court declines to be the first court to expressly extend *Hill* to Section 1981 actions.

More importantly, however, is the fact that the *Hill* Court made clear that the "'ultimate question in . . . discrimination case[s]" remains "whether the plaintiff was the victim of intentional discrimination.'"  *Hill*, 354 F.3d at 286 (quoting *Reeves v.*

*Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000)).   When
considering whether the Court erred in denying a Motion for Judgment
as a Matter of Law in a discrimination case, the Court must first
consider whether the Plaintiff has established a prima facie case of
discrimination.   *Reeves*, 530 U.S. at 141. To establish a prima face
case of discrimination, WWNS must have demonstrated that it: (1) is
a member of a minority group; (2) was qualified to perform the
obligations set forth in the subcontracts; (3) despite its
qualifications and performance, it was terminated; and (4) after its
termination, DynCorp retained another company from an unprotected
class.   *Davis*, 330 F. Supp. 2d at 655 (citing *McDonnell Douglas
Corp. v. Green*, 411 U.S. 792, 802 (1973)).   As the Court held in its
Memorandum Order denying DynCorp's summary judgment motion with
respect to the Section 1981 claim,[4] WWNS has established a prima
facie case for discriminatory termination.   First, WWNS is certified
as a Section 8(a) minority-owned small business.   Second, WWNS
received positive evaluations from Richard Cashon, DynCorp's Vice
President of the CivPol program, as well as from John Supina,
DynCorp's Vice President for Contracts and Gene Trammel, DynCorp's
Deputy Program Manager for the AEF task order.   Mr. Cashon submitted
WWNS as a subcontractor on bids that DynCorp made to the government
for additional work where he told prospective government contracting
officials that WWNS rendered competent services.   Third, DynCorp

---

[4]*See* Order granting in part and denying in part DynCorp's
Motion for Summ. J., 1:07cv627 Doc. No. 347, April 17, 2008.

terminated its business relationship with WWNS, deciding not to exercise its option to extend the CivPol subcontract.  Finally, DynCorp retained EDO Corporation to replace WWNS, a non-minority owned company.

Consequently, the burden shifted to DynCorp to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Dept. of Comty Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  DynCorp satisfied its burden of production by producing performance evaluations which were highly critical of WWNS, among other evidence.  Thus, the sole remaining issue for trial was whether WWNS had proved, by a preponderance of the evidence, that DynCorp's proffered rationale for its termination of WWNS (i.e. WWNS's poor performance) was mere pretext and that race based discrimination was the real reason for DynCorp's less than favorable treatment of WWNS. *Davis*, 330 F. Supp. 2d at 655 (citing *McDonnell Douglas*, 411 U.S. at 802).  *See also Burdine*, 450 U.S. at 253.  Evidence of pretext, does not, when combined with the plaintiff's prima facie case, compel judgment for the plaintiff because "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 146.  The *Reeves* Court explains that under appropriate circumstances a plaintiff's prima facie case, combined with sufficient evidence to find that the defendant's asserted justification is false, may permit the trier of fact to conclude

-19-

that the defendant unlawfully discriminated.  *Id.* at 148.

At trial, WWNS produced evidence disputing DynCorp's assertion that Mr. Cashon was the sole decisionmaker with respect to WWNS's termination.  Specifically, WWNS presented testimony that Richard Walsh, Robert Rosenkranz and Leon DeBeer collectively, along with Mr. Cashon, made the decision to end DynCorp's contractual relationship with WWNS.  (*See* Trial Tr. 148:14-24, April 24, 2008; Trial Tr. 53:5-57:5, April 28, 2008; Trial Tr. 123:12-25, May 1, 2008).  WWNS produced numerous performance evaluations in which Mr. Cashon consistently gave WWNS high marks.  WWNS also produced evidence that it was Mr. Walsh who directed DynCorp employees to stop payment to WWNS on its submitted invoices and Mr. Walsh who actively worked with WWNS's replacement, EDO Corporation, unbeknownst to WWNS.  (*See e.g.* Pl.'s Trial Tr. Ex. 239, 290).  Even more significantly, WWNS produced evidence of Messrs. Walsh and Rosenkranz's racial animus.  Richard Spencer testified that Mr. Walsh received a t-shirt at an October 2006 company dinner that stated, "I Took Down WWNS and All I Got was This Lousy T-Shirt." (J. Stipulation, 1:07cv627 Doc. No. 455, Aug. 29, 2008.)  Mr. Spencer also testified that Mr. Walsh was presented with a letter purporting to be from WWNS President Walter Gray.  The letter was read in Ebonics[5] and Mr. Spencer observed that both Messrs. Walsh

---

[5]"Ebonics," also referred to as "Black English" or " African American Vernacular English," is a term describing any of the nonstandard varieties of English spoken by African Americans. *The American Heritage Dictionary* 30, 564 (4th ed. 2000).

and Rosenkranz found the presentation of the letter to be humorous. *Id.*  Irregardless of the application of *Hill's* standard for determining whether the racial motivation of a corporation's employees may be imputed to the corporation for purposes of determining whether a particular decision was racially motivated, the credibility of DynCorp's evidence that Mr. Cashon was the sole decisionmaker and that his decision to terminate DynCorp's contractual relationship with WWNS was based on WWNS's poor performance, when viewed in light of WWNS's significant evidence of mendacity, was a question of fact for the jury.  *See Reeves*, 530 U.S. at 147 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination").  Under Rule 50(a), a court may not enter judgment as a matter of law where a jury issue is created.  *See Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 490 (4th Cir. 2005).  The Court, therefore, did not err in denying DynCorp's Motion for Judgment as a Matter of Law. The Court denies DynCorp's Renewed Motion for Judgment as a Matter of Law, pursuant to Rule 50(b), because based on the evidence produced by both parties at trial, a reasonable jury could reject DynCorp's evidence that Mr. Cashon was the sole decisionmaker who decided to terminated DynCorp's contractual relationship with WWNS

due to poor performance, and find that DynCorp's rationale constituted mendacity and thus, was nothing more than mere pretext for discrimination.

### b.   Tortious Interference with Contract Claim

The Court denies DynCorp's Renewed Motion for Judgment as a Matter of Law with respect to the tortious interference with contract claim because there is evidence upon which a reasonable jury could return a verdict in favor of WWNS and WWNS FZCO.

In order to prevail on a claim of tortious interference with an at-will contract, WWNS and WWNS FZCO were required to prove the following elements: (1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship; and (4) resultant damage to the party whose relationship has been disrupted. *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 210 (4th Cir. 2001) (quoting *Chaves v. Johnson*, 334 S.E.2d 97, 102 (Va. 1985)).  When a contract is terminable at will, a plaintiff must also prove that the defendant employed improper methods. *Duggins v. Adams*, 360 S.E.2d 832, 836 (Va. 1987).

DynCorp argues that the Court erred in denying its Motion for Judgment as a Matter of Law on WWNS's and WWNS FZCO's claim of tortious interference with contract because there is no evidence that DynCorp intentionally induced any former WWNS employee to fail to provide 15 days notice of termination of their employment

-22-

agreements with WWNS FZCO,,even assuming that such notice was
required.   Thus, DynCorp's contention centers around the third
requirement under *Commerce Funding Corp.* - intentional interference
inducing or causing a breach or termination of the relationship.

The record reflects that DynCorp's in-country managers Leon
DeBeer and Ken Kaufmann held a meeting July 26, 2006, at which they
notified WWNS personnel that WWNS's subcontract would be terminated
August 11, 2006, and that as of July 26, 2006, all WWNS employees
should report to DynCorp via Mr. DeBeer.   (Pl's Trial Exs. 34-35).
That same day, counsel for WWNS sent DynCorp a letter via e-mail and
overnight mail requesting that DynCorp "immediately cease its
interference with WWNS's employment contracts with its Iraq-based
employees."   (Pl.'s Trial Ex. 174.)   DynCorp subsequently convened
another meeting July 27, 2006, at which DynCorp recanted its
statements of July 26, 2008, and notified WWNS personnel that they
continued to be considered WWNS employees and would no longer work
in support of the CivPol subcontract after August 11, 2006.   (Trial
Tr. 131:15-133:15, April 29, 2008.)   Thereafter, DynCorp began to
make employment offers to select WWNS employees in Iraq in order to
prevent a "disruption in service."   (Pl.'s Trial Ex. 222; *see also*
Pl.'s Trial Ex. 518).   In viewing the evidence in the light most
favorable to WWNS and WWNS FZCO, as the Court is required to do on a
Rule 50(b) motion, the Court finds that a reasonable jury could
return a verdict on the tortious interference with contract claim in
favor of Plaintiffs because the evidence supports a finding that

-23-

DynCorp tortiously interfered with WWNS and WWNS FZCO employment contracts, which induced the employees in question to terminate their relationship with WWNS and WWNS FZCO.  DynCorp's Renewed Motion for Judgment as a Matter of Law is therefore denied.

### 2.  Motion for a New Trial

#### a.  Failure to Give Jury Instruction based on Hill v. Lockheed Martin

The Court denies DynCorp's Motion for a New Trial on the basis of DynCorp's allegation that the Court erred in refusing to give a jury instruction based on the holding in *Hill* because DynCorp has not demonstrated that *Hill* was a correct statement of law, that imputation of an employee's racial animus to DynCorp was not covered by another instruction, or that the Court's refusal seriously impaired DynCorp's ability to conduct a defense.

DynCorp argues that the Court erred in declining to give the portion of DynCorp's proposed Section 1981 jury instruction which addressed the Fourth Circuit's holding in *Hill* because: (1) it was a correct statement of the law; (2) imputation of an employees' racial animus to DynCorp was not covered by another instruction; and (3) without the guidance of the *Hill* instruction, the jury "almost certainly" attributed the alleged racial animus of subordinate employees to DynCorp.

The standard of review for determining whether the district court should have given a jury instruction is abuse of discretion. *United States v. Ruhe*, 191 F.3d 376, 384 (4th Cir. 1999) (citing

-24-

*United States v. Abbas*, 74 F.3d 506, 513 (4th Cir. 1996)).  "The test of the adequacy of jury instructions is whether the jury charge, construed as a whole, adequately states the controlling legal principle without misleading or confusing the jury." *Chaudhry v. Gallerizzo*, 174 F.3d 394, 408 (4th cir. 1999). "A district court's refusal to provide an instruction requested by a defendant constitutes reversible error only if the instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995)(internal quotations and citations omitted).

As the Court previously discussed, the Fourth Circuit's holding in *Hill* has never been extended beyond claims brought under Title VII and the ADEA, and the Court declines to be the first court to expressly do so. Given that no court has ever held that the standard articulated in *Hill* for determining whether racial motivation of a corporation's employees may be imputed to the corporation for purposes of determining whether a particular decision to terminate a contractual relationship was racially motivated, the Court finds that the *Hill* standard is not a correct statement of law for claims brought under 42 U.S.C. § 1981.

Notwithstanding the issue of whether *Hill* applies to Section 1981 claims, *Hill* did not alter the plaintiff's burden of proof in

-25-

discrimination cases.  Rather, it echoed the Supreme Court's rule
that "'the ultimate question in . . . discrimination case[s] . . .
is whether the plaintiff was the victim of intentional
discrimination."  *Hill*, 354 F.3d at 286 (quoting *Reeves*, 530 U.S. at
141).  *Hill's* holding that racial motivation is imputed to a
corporation only where a plaintiff has produced sufficient evidence
that the employee principally responsible for the decision to
terminate the plaintiff was racially motivated, whether that person
was the actual decisionmaker or a subordinate employee, is congruent
with a plaintiff's ultimate burden of proof.  If a plaintiff
produces evidence of racial animus on the part of an employee who
was not significantly involved in the alleged discriminatory action,
then the plaintiff has failed to satisfy his or her burden of
proving the corporation <u>intentionally</u> discriminated against the
plaintiff.  Individuals not principally involved in the
decisionmaking process have no influence over the conduct at issue.

     Here, the Court adopted whole cloth DynCorp's proffered Section
1981 jury instruction, excluding only the language specifically
addressing *Hill's* holding.[6]  (*See* Jury Instruction No. 10, 1:07cv627
Doc No 395, Supp. 1, May 7, 2008; Trial Tr. 11:2-18:17, May 7,
2008.)  The Section 1981 instruction, Jury Instruction No. 10, was

---

     [6]The Court notes that, at the request of DynCorp, it charged
the jury with the *Price Waterhouse* "same decision" instruction
twice, over WWNS's written and verbal objections.  (*See* Trial
Tr.22:13-28:19, May 6, 2008; Trial Tr. 15:5-9; 18:8-14, May 7,
2008.)

taken verbatim from the model Section 1981 federal jury
instructions,[7] and charged the jury that:

> [i]n order for WWNS to recover on its claim against
> DynCorp, WWNS must prove that DynCorp <u>intentionally</u>
> discriminated against WWNS.  That is, the race of
> WWNS's owners must be proven to have been a
> <u>motivating factor</u> in DynCorp's decision not to renew
> WWNS's CIVPOL subcontract or issue further task
> orders thereunder.

Jury Instruction No. 10, 1:07cv627 Doc. No. 395 Supp. 1, May 7, 2008
(emphasis added).)  Jury Instruction No. 10 goes on to define
"motivating factor" as evidence that "must show that, but for the
race of WWNS's owners, DynCorp would have renewed or extended WWNS's
CIVPOL subcontract or task orders."  *Id.*  The instruction notes that
the term "motivating factor" does not mean that race was the only
motivation for DynCorp's decision, but "it must have been a factor
<u>that actually led to the decision</u>."  *Id.* (emphasis added).  This
accurate statement of the law clearly embodies the holding in *Hill* -
that racial animus must have been a factor that led to the decision
at issue.  Stated another way, the holding in *Hill* that the person
or persons responsible for the decision to terminate the plaintiff
must have been racially motivated, is merely an example of the
current status of the law regarding discriminatory actions.
Accordingly, the Court finds that Jury Instruction No. 10 is a
correct statement of the law that encompasses, rather than excludes,
the holding in *Hill*.  Moreover, the Court finds that the holding in

---

[7]*See* 3 Kevin F. O'Malley, et al., Federal Jury Practice and
Instructions - Civil § 170.01 (5th ed. 2000).

*Hill* was substantially covered in Jury Instruction No. 10's definition of the term "motivating factor."

Further, the Court finds that its refusal to give an instruction articulating the specific holding in *Hill* did not seriously impair DynCorp's ability to conduct its defense. Throughout the trial, DynCorp presented evidence portraying Mr. Cashon as the sole decisionmaker and describing the acts demonstrating racial animus as isolated incidents by subordinate employees who did not play a significant role in the decision to terminate DynCorp's contractual relationship with WWNS. WWNS, however, produced ample contradictory evidence. As previously discussed, Messrs. Cashon, Walsh and Rosenkranz all testified that they, with input from Leon DeBeer, collectively made the decision to end DynCorp's contractual relationship with WWNS. (*See* Trial Tr. 148:14-24, April 24, 2008; Trial Tr. 53:5-57:5; 123:12-25, April 28, 2008.) Moreover, the record reflects that Mr. Cashon's credibility was undermined by his own words and actions; although he testified that his decision to terminate DynCorp's contractual relationship with WWNS was based on WWNS's poor performance, WWNS produced numerous performance evaluations in which Mr. Cashon gave WWNS high marks. Jury Instruction No. 10 charged the jury with reconciling this contradictory evidence and finding for WWNS if the jury determined that racial animus was a factor that led to WWNS's termination. The jury's verdict demonstrates that it complied with its charge. DynCorp has not demonstrated that the jury's verdict is

-28-

against the clear weight of the evidence or that the verdict will result in a miscarriage of justice.  Accordingly, the Court denies DynCorp's Motion for a New Trial based on the Court's refusal to give a jury instruction regarding the holding in *Hill*.

> b. **Admission of Certain Testimony in the Wake of the Court's Refusal to Give a Jury Instruction based on the holding in <u>Hill</u>**

The Court denies DynCorp's Motion for a New Trial based on the admission of certain testimony regarding DynCorp's alleged racial animus because the Court did not error in refusing to give an instruction based on the holding in *Hill*, and DynCorp has not established that a miscarriage of justice will result if a new trial is not granted based on the admission of the testimony.

DynCorp argues that the Court's failure to give a jury instruction based on the holding in *Hill* was compounded by erroneously admitting certain testimony of the racial animus of individuals other than Richard Cashon, the individual DynCorp asserts to have made the decision to terminate DynCorp's relationship with WWNS.  Specifically, DynCorp contends that the admission of John Mack's rebuttal testimony, during which he recalled an instance where Richard Walsh referred to Walter Gray as "a stupid black mother -" (Trial Tr. 157:6, May 6, 2008), was unduly prejudicial and deprived DynCorp of a fair trial because WWNS failed to disclose the substance of Mr. Mack's testimony prior to trial and Mr. Walsh was portrayed as a decisionmaker.  DynCorp also asserts that the Court erroneously allowed: (1) Richard Spencer to testify

-29-

about his allegation that DynCorp fired him because he is Hispanic, and (2) Charles Jones to testify regarding his allegation that DynCorp security personnel forcibly removed him from Iraq at gunpoint and confiscated his personal property.

As an initial matter, the Court notes that rulings related to the admission and exclusion of evidence are addressed to the sound discretion of the Court and will not be reversed absent an abuse of that discretion. *United States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995). To the extent that DynCorp's arguments are based on the Court's failure to give a jury instruction based on the holding in *Hill*, the Court rejects DynCorp's contentions that the Court's refusal to give such an instruction was erroneous and prejudiced the verdict for the reasons previously stated.

### 1.   Rebuttal Testimony of John Mack

The Court denies DynCorp's Motion for a New Trial on the basis of John Mack's rebuttal testimony because its admission was harmless and thus will not result in a miscarriage of justice. Federal Rule of Civil Procedure 37(c) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

FED. R. CIV. P. 37(c). Courts apply a five factor test to determine whether a nondisclosure is substantially justified or harmless: (1) the surprise to the party against whom the evidence would be

offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence. *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-97 (4th Cir. 2003). The first four factors relate mainly to the harmlessness exception. *Id.* at 597.

WWNS does not dispute that it failed to disclose Richard Walsh's racial slur to DynCorp in violation of Federal Rule of Civil Procedure 26. However, it contends that its nondisclosure was harmless. The Court agrees.

First, it is undisputed that Mr. Mack's testimony regarding Richard Walsh's racial slur about Walter Gray was a surprise to DynCorp; thus, this factors weighs against a finding of harmlessness. Second, WWNS only learned of Mr. Mack's recollection of Mr. Walsh's racial slur approximately four days prior to Mr. Mack's rebuttal testimony. However, WWNS did not notify DynCorp of its discovery. Consequently, the second factor also weighs against a finding of harmlessness. Third, the record reflects that Mr. Mack's testimony regarding Mr. Walsh's racial slur did not disrupt the trial until well after it was given and the disruption was minor. DynCorp did not immediately object to Mr. Mack's statement. Rather, counsel for DynCorp commenced its cross-examination, asking Mr. Mack more than fifteen questions, during which counsel for WWNS raised two objections, before finally asking the Court if the

-31-

parties could approach the bench.  (*See* Trial Tr. 157:5-162:4, May 6, 2008.)  At the sidebar conference, DynCorp requested that the Court give both an immediate oral limiting instruction and a written instruction when charging the jury. (*Id.* at 165:13-19).  The Court agreed, gave the oral cautionary instruction, and DynCorp continued with its cross-examination.[8]  Accordingly, this factors weighs in favor of a harmless finding.

Fourth, and most importantly, DynCorp's failure to make a contemporaneous objection to Mr. Mack's testimony demonstrates that DynCorp itself did not view Mr. Mack's statement as overly important.  Moreover, as Plaintiffs note, the record is replete with evidence of racial animus including the October 2006 dinner at which Mr. Walsh was presented with a t-shirt that states, "I brought down WWNS and all I got was this lousy t-shirt," and was read a letter purporting to be from Walter Gray in Ebonics.  (*See* Trial Tr. 153:4-5, April 28, 2008; J. Stipulation, 1:07cv627 Doc. No. 455, Aug. 29, 2008).  When viewed in light of DynCorp's failure to disclose that Ms. Jasbir Gill would testify that DynCorp rejected certain unpaid invoices previously identified as pending review, the Court's admonishment of DynCorp's nondisclosure in the form of both an immediate oral cautionary instruction and a written instruction, and the Court's parallel treatment of WWNS's nondisclosure, the Court

---

[8]The Court also charged the jury with a limiting instruction.  (*See* Jury Instruction No. CC, 1:07cv627 Doc. No. 395 Supp. 1, Aug. 29, 2008.)

-32-

finds that WWNS's failure to disclose Mr. Mack's testimony regarding the racial slur by Mr. Walsh was harmless, did not result in a miscarriage of justice, and, therefore, does not support the grant of a new trial.

> **2.   Testimony of Richard Spencer and Charles Jones**

The Court denies DynCorp's Motion for a New Trial on the basis of the admission of Richard Spencer's testimony regarding his allegations that he lost his job with DynCorp because he is Hispanic and Charles Jones's testimony regarding his forceful departure from Iraq because both Mr. Spencer's and Mr. Jones's testimony was relevant and the probative value of their testimony is not substantially outweighed by the damage of unfair prejudice.

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. All relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. FED. R. EVID. 402, 403.

This case involves a claim of discrimination in contracting brought under 42 U.S.C. § 1981. WWNS was required to prove at trial that DynCorp's legitimate nondiscriminatory reason for terminating its contractual relationship was a pretext for race based

-33-

discrimination. *See Davis v. Am. Soc'y of Civil Engineers*, 330 F. Supp. 2d 647, 655 (E.D. Va. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

DynCorp argues that Mr. Spencer's testimony regarding his allegation that he lost his job with DynCorp because he is Hispanic is irrelevant and prejudicial. The Court, to the contrary, finds Mr. Spencer's testimony to be relevant to the issue of pretext as it demonstrates DynCorp's corporate attitude toward minorities and provides insight into what factors contributed to DynCorp's decision to terminate its relationship with WWNS. The probative value of this evidence is not substantially outweighed by the danger of its prejudicial effect.

DynCorp also argues that Mr. Jones's testimony regarding his forceful removal from his room at the Baghdad Hotel and the contemporaneous confiscation of his personal effects by DynCorp personal was irrelevant and highly prejudicial. Mr. Jones testified at trial that he was told by Mr. DeBeer, whom was accompanied by armed personnel, that he was under arrest, that he was being escorted out of the premises, and if he failed to obey, deadly force would be used to remove him from WWNS office space. (Trial Tr. 53:13-54:3, April 24, 2008.) Mr. Jones further testified that DynCorp personnel subsequently pointed a gun at his chest. (*Id.* at 54:20-24). This testimony is relevant to the issue of pretext as it is illustrative of the manner in which DynCorp chose to treat WWNS employees and to effectuate its termination of WWNS as a

-34-

subcontractor.   As such, Mr. Jones's testimony is highly probative and its probative value is substantially outweighed by the danger of unfair prejudice to DynCorp.

The Court, therefore, denies DynCorp's Motion for a New Trial on the basis of the admission of the testimony of Messrs. Mack, Spencer and Jones because DynCorp has not established a miscarriage of justice will occur if a new trial is not granted.

### c. Exclusion of the Testimony of Messrs. Kellogg and Merriman and Mr. Kellogg's Reports

The Court denies DynCorp's Motion for a New Trial based on the Court's exclusion of the testimony of Christopher Kellogg and Ronald "Scott" Merriman along with two reports authored by Mr. Kellogg because Messrs. Kellogg and Merriman were undisclosed expert witnesses whose testimony was cumulative, and the reports constitute expert evidence that were not properly designated, which contain hearsay.

DynCorp first argues that the Court erroneously excluded the testimony of Messrs. Kellogg and Merriman because Messrs. Kellogg and Merriman, although technical experts in their fields, were offered as fact witnesses with personal knowledge, not as expert witnesses.   DynCorp asserts that Mr. Kellogg would have testified to his personal knowledge of WWNS's poor performance in the areas of wiring, networking, internet reliability, satellite, and long distance radio communications.   DynCorp asserts that Mr. Merriman would have testified about his role in mentoring WWNS regarding IT

and internet communications issues, as well as what he heard from
WWNS regarding deficient network designs.   However, DynCorp conceded
at trial that Messrs. Kellogg and Merriman's proposed testimony was
duplicative of testimony already presented to the jury.   (Trial Tr.
6:9-20, May 5, 2008.)

   Federal Rule of Evidence 701 provides:

> If [a] witness is not testifying as an expert, the
> witness' testimony in the form of opinions or
> inferences is limited to those opinions or
> inferences which are (a) rationally based on the
> perception of the witness, (b) helpful to a clear
> understanding of the witness' testimony or the
> determination of a fact in issue, and (c) not based
> on scientific, technical, or other specialized
> knowledge within the scope of Rule 702.

FED. R. EVID. 701.   The Fourth Circuit has made clear that Rule 701
"forbids the admission of expert testimony dressed in lay witness
clothing."   *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir.
2006).   A trial court's decision regarding whether a witness should
be allowed to testify is generally reviewed for abuse of discretion.
*United States v. Fulks*, 454 F.3d 410, 422 (4th Cir. 2006).

   Christopher Kellogg is DynCorp's Tiger Team leader and author
of the two reports also at issue here – the Tiger Team's assessment
of WWNS's work in Afghanistan and an Iraq Assessment Report
evaluating WWNS's performance.   On page two of the Tiger Team
report, the assessment team is referred to as being comprised of
"subject matter experts in the primary fields of concern":
Communications (Codan HF systems, VHF/UHF Radio), Satellite
Communications, and Information Technology.   (Pls.' Br. Supp. Mot.

in Limine to Exclude the Testimony of Chris Kellogg and Ronald "Scott" Merriman and Exclude DI Exhibit 170 Ex. A). The report itself contains highly technical information that is outside the knowledge of an average lay person. Further, Mr. Kellogg's proposed testimony could not possibly be based solely on his personal knowledge because the Tiger Team report, although identifying him as the author, lists him as an expert in information technology and information security. Four other team members are also identified as having contributed to the report and each specializes in areas other than information technology and information security; areas that DynCorp proffered Mr. Kellogg would testify about. Mr. Kellogg's proposed testimony therefore constitutes testimony that is based on scientific, technical, or other specialized knowledge. Moreover, it is not limited to his personal knowledge. The Court therefore affirms its ruling at trial that Mr. Kellogg is an expert, rather than a fact, witness.

Likewise, Mr. Merriman is also an expert witness. Richard Walsh repeatedly referred to Mr. Merriman as a technical expert during his testimony at trial. (*See* Trial Tr. 171:11-20; 191:4-8, April 30, 2008; Trial Tr. 111:9-16, May 1, 2008.) Having already presented Mr. Merriman as an expert, DynCorp may not now deny his expert status.

There is no dispute that DynCorp did not identify Messrs. Kellogg and Merriman as expert witnesses as required by the federal discovery rules. Thus, pursuant to Federal Rule of Civil Procedure

37(c), the Court properly excluded Messrs. Kellogg and Merriman's testimony. Furthermore, given DynCorp's concession that Messrs. Kellogg and Merriman's testimony was duplicative of testimony given by Richard Walsh and other witnesses, the Court was well within its discretion to exclude such cumulative evidence.

DynCorp also argues that the Court erroneously excluded the two reports authored by Mr. Kellogg, although it does not dispute that it did not provide the reports to WWNS until the eve of trial. As discussed above, however, the reports represent a compilation of assessments of WWNS's performance in both Iraq and Afghanistan by experts in the subject matter fields. The reports thus constitute expert evidence not properly disclosed or designated. Given that the reports, although authored by Mr. Kellogg, are the product of a team assessment effort, they also contain hearsay.

Accordingly, the Court denies DynCorp's Motion for a New Trial based on the Court's exclusion of Messrs. Kellogg and Merriman's testimony and the two reports authored by Mr. Kellogg because Messrs. Kellogg and Merriman are expert witnesses not properly designated whose proposed testimony would have been cumulative, and the reports, as the foundation for Mr. Kellogg's proposed testimony, also constitute expert evidence not properly designated, which contains hearsay.

### d. *Exclusion of WWNS's Document Destruction*

The Court denies DynCorp's Motion for a New Trial with respect to its claim that the Court erroneously excluded evidence of WWNS's

-38-

destruction of certain documents in Iraq because the documents at issue are immaterial, and thus, do not justify imposition of sanctions.

DynCorp contends that the Court applied the wrong legal standard when it denied DynCorp's Motion to Dismiss or in the Alternative to Draw Adverse Inferences by imposing the burden on DynCorp to demonstrate that the destroyed documents were material and that DynCorp suffered prejudice as a result of the destruction.

The Court acknowledges that it misstated its holding when it, in denying DynCorp's Motion to Dismiss or in the Alternative to Draw Adverse Inferences, concluded that DynCorp had failed to show that the destroyed documents were material. The misstatement, however, was not reflective of the Court's analysis in which the Court concluded that WWNS had demonstrated that the destroyed documents were immaterial because the destroyed logs were from "years and years back" and the personnel files were duplicates.  (Order denying Motion to Dismiss, 1:07cv627 Doc. No. 347, April 17, 2008.) Nevertheless, the Court will readdress the issue of spoilation here.

"Spoilation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).  "The right to impose sanctions for spoilation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress

-39-

conduct "which abuses the judicial process." *Id.* (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)). Thus, "assessment of sanctions depends most significantly on the blameworthiness of the offending party and the prejudice suffered by the opposing party." *Trigon Ins. Co. v. U.S.*, 204 F.R.D. 277, 288 (E.D. Va. 2001). *See also Silvestri*, 271 F.3d at 590 ("a court must find some degree of fault to impose sanctions").

To establish a claim for spoilation, a movant must show that the adverse party had a duty to preserve the allegedly spoiled documents and that the documents were intentionally destroyed. *Trigon Ins. Co.*, 204 F.R.D. at 286. If the movant satisfies this burden and establishes a claim for spoilation, the natural consequence of the spoilation is that the moving party was prejudiced by the destruction. *Trigon Ins. Co.*, 204 F.R.D. at 286. However, to draw an adverse inference from the intentional destruction of evidence, the destroyed evidence must have been relevant to an issue at trial and otherwise would have naturally been introduced into evidence. *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995). If the destroyed evidence is material, the spoiler's degree of culpability and the prejudice suffered by the moving party will guide a court in its formulation of remedial and punitive action. *Id.*

The record demonstrates that WWNS unquestionably had a duty to preserve evidence it knew, or reasonably should have known, would be relevant to future litigation. As DynCorp notes in its memorandum

-40-

in support of this motion, WWNS's CivPol manager Benjamin Posil destroyed the documents at issue nineteen days after WWNS had formally threatened DynCorp with litigation.   The record also demonstrates that Mr. Posil's destruction of the documents was intentional; he testified at his deposition that he conferred with unidentified persons at WWNS's headquarters and that, collectively, a decision was made to burn the documents at issue, including personnel files and radio/help-desk logs.   (See Def's Mem. Supp. Motion J. Matter of Law, Motion Alter or Amend J., Motion New Trial Ex. 8 at 183:20-184:1.)   DynCorp thus satisfied its burden of establishing spoliation and is entitled to a presumption of prejudice if the destroyed evidence is material.

The Court affirms its previous finding that the destroyed documents are not material.   Mr. Posil oversaw the shut down of WWNS's operation in Baghdad and, at the direction of WWNS's management, including President Walter Gray and Human Resource Manager Raquel Paulo, burned two oil barrels of documents.   Mr. Posil testified during his deposition that he was "very careful to consolidate and bring back, anything related to [WWNS's] performance." (Posil Dep. at 176:1-3).   The only radio-related documents that may have been destroyed were logs of radio checks from "years and years back." (Id. at 175:5).   DynCorp's concerns about WWNS's performance are primarily limited to 2006, the year the two reports assessing WWNS's performance were authored by Mr. Kellogg.   Logs from radio checks prior to that time frame are not

-41-

relevant to the issue of WWNS's performance - especially in light of the positive performance evaluations DynCorp gave WWNS.  Mr. Posil did testify at his deposition that customer help desk request logs were destroyed because they were voluminous and Mr. Posil's ability to ship large quantities of paperwork was limited.  (*Id.* at 176:4-11).  But the Court remains unpersuaded that these help desk logs, in which customers requests and the corresponding resolutions were noted, are material to WWNS's performance; nothing in the record indicates that these logs contained customer feedback about WWNS's responsiveness or the quality of WWNS's work.  Accordingly, the Court finds that the help desk logs are not material.

With respect to the personnel files, Ms. Paulo instructed Mr. Posil not to send or otherwise bring back the personnel files to WWNS's Washington office because "she had been provided a copy of everything that went in there in Iraq."  (*Id.* at 172:21-22).  Although Ms. Paulo acknowledges that some of the personnel files may be incomplete due to her failure to adequately file some personnel documents, documents such as resumes, job applications, offer letters, employment agreements, performance reviews, and interview notes have no bearing on WWNS's claim that DynCorp tortiously interfered with WWNS and WWNS FZCO's employment contracts. Therefore, the personnel files Mr. Posil destroyed are not material.

Having concluded that the destroyed evidence was immaterial, DynCorp is not entitled to a presumption of prejudice and imposition of a sanction is not justified.  Even if the Court had found the

-42-

destroyed evidence to be material, the prejudice to DynCorp is
negligible; DynCorp presented ample evidence at trial of its
displeasure with WWNS's performance.  Furthermore, Mr. Posil's
destruction of the evidence, although deliberate, was not
blameworthy given the circumstances surrounding WWNS's termination
and the short time period in which DynCorp demanded that WWNS cease
operations and depart Iraq.  Under these circumstances, sanctions
are not appropriate.  DynCorp, therefore, has not demonstrated that
a new trial is warranted under Federal Rule of Civil Procedure 59(a)
for the Court's exclusion of spoilation evidence.

### e.    *The Verdict Form and WWNS FZCO*

The Court denies DynCorp's Motion for a New Trial with respect
to its contention that the Court erred in preparing a general
verdict form that allowed the jury to award damages to WWNS FZCO on
claims other than tortious interference with contract because
DynCorp failed to raise this issue during trial and no such
limitation was placed on WWNS FZCO's joinder as a Plaintiff and
Counter-Defendant in this lawsuit.

DynCorp argues that WWNS FZCO was joined as a plaintiff in this
action only to cure a technical defect in WWNS's tortious
interference with contract claim; a defect that came to light in EDO
Corporation's Motion for Summary Judgment.  Given the reason for
WWNS FZCO's joinder to this action, DynCorp asserts that WWNS FZCO
is not a real party in interest with respect to the other claims
upon which WWNS prevailed and may not recover with respect to those

claims.   The only authority Dyncorp cites in support of its position
is *Turner v. The Rams-Head Co.*, 2007 WL 61014 (D.S.C. Jan. 5, 2007).
*Turner* is an unpublished opinion from the District of South Carolina
in which the district court reviewed and adopted a report and
recommendation prepared by a magistrate judge.  As such, it is not
binding authority upon this Court, and the Court finds it
unpersuasive.

     The Court invited the parties to submit proposed verdict forms
in advance of trial.  Plaintiffs and DynCorp each submitted a
special verdict form that required the jury to answer more than 60
questions.  The Court found the proposed special verdict forms to be
excessive and it prepared a general form to be submitted to the
jury.  Prior to submitting the verdict form to the jury, the Court
gave Plaintiffs and DynCorp a draft of the verdict form to review
and invited counsel to make revisions.  Both Plaintiffs and DynCorp
made revisions to the breach of contract counts, and changed both
the wording and placement of the pre-judgment interest questions.
The Court implemented the parties' changes *in toto* and provided the
parties with an opportunity to review the final draft of the verdict
form before it was sent back to the jury.  At no time during that
process, or at any other time either on or off the record, orally or
in writing, did DynCorp raise the issue of WWNS FZCO being
identified as a Plaintiff and Counter-Defendant for all counts and
counterclaims listed on the form.  A motion for a new trial cannot
be based on alleged errors in a verdict form when no corresponding

-44-

objections were raised at trial.  *See Givens v. O'Quinn*, 447 F.

Supp. 2d 593, 601 (W.D. Va. 2006).

    Moreover, the Court granted WWNS's Motion to Join Worldwide

Network Services International, WWNS FZCO without any limitation on

the scope of WWNS FZCO's joinder.  (*See* Order granting Motion for

Joinder, 1:07cv627 Doc. No. 223, March 13, 2008.)  Federal Rule of

Civil Procedure 17(a)(3) provides that after joinder of a real party

in interest, "the action proceeds as if it had been originally

commenced by the real party in interest."  Without limiting the

scope of WWNS FZCO's participation in this suit, WWNS FZCO, under

Rule 17(a)(3), adopted WWNS's Amended Complaint as its own *in toto*.

The Court's identification of WWNS FZCO as a co-plaintiff in this

entire action is consistent with its March 13, 2008 Order and the

prescriptions of Rule 17(a)(3).  Thus, a miscarriage of justice will

not occur if the Court does not set aside the jury's verdict based

on the identification of WWNS FZCO on the verdict form as a

Plaintiff and Counter-Defendant for all claims.  DynCorp's Motion

for a New Trial with respect to the verdict form is therefore

denied.

### 3.  Motion to Alter or Amend the Court's Grant of Plaintiffs' Rule 50(a) Motion Regarding Certain Unpaid Invoices

    The Court denies DynCorp's Motion to Alter or Amend Judgment,

pursuant to Federal Rule of Civil Procedure 59(e), with respect to

the Court's grant of the Plaintiffs' Motion for Judgment as a Matter

of Law on their breach of contract claims for certain unpaid

invoices because the subcontracts did not provide DynCorp with the
right to withhold the processing of invoices remitted for payment
indefinitely.

DynCorp contends that the Court erred in granting Plaintiffs'
Motion for Judgment as a Matter of Law with respect to certain
invoices still pending review because WWNS did not carry its burden
of proving it had delivered acceptable services as required by both
the WPPS and CivPol subcontracts.  At the outset, the Court notes
that DynCorp filed a Motion for Reconsideration of the Court's Order
granting Plaintiffs' Renewed Motion for Judgment as a Matter of Law
with respect to certain unpaid invoices still pending review in
which it did not address the specific concerns it now advances in
its Motion to Alter or Amend Judgment.  (See Renewed Motion J.
Matter of Law, 1:07cv627 Doc. No. 400, May 13, 2008.)  Nevertheless,
the Court will consider DynCorp's new argument in support of its
position that the Court should vacate the June 17, 2008 Amended
Order granting Plaintiff's motion and entering judgment in favor of
Plaintiffs in the amount of $ 2,553,105.86 (Amended Order granting
Motion J. Matter of Law, 1:07cv627 Doc. No. 414, June 17, 2008.)

Under Delaware law, the law WWNS and DI selected to govern both
the WPPS and CivPol subcontracts, "the elements of a breach of
contract claim are: (1) a contractual obligation; (2) a breach of
that obligation by the defendant; and (3) a resulting damage to the
plaintiff."  *H-M Wexford, LLC v. Encorp, Inc.*, 832 A.2d 129, 140
(Del Ch. 2003).

-46-

Article 11.1 of the WWPS subcontract provides that WWNS, as the subcontractor:

> shall be paid for performance hereunder in
> accordance with the terms of payment of this
> Subcontract, upon submission of proper invoices and
> Buyer approval.  The payment terms are Net 15 days
> after both (a) Buyer receipt of Subcontractor
> invoice and (b) delivery of acceptable services . .
> . .

(Pl's Trial Ex. 184.012.)  Article 11.6 provides that

"[d]iscrepancies in invoices may result in a delay of payment

pending resolution of discrepancy(s).  However, discrepancies not

identified and relayed to WWNS within 5 work days of receipt by

DynCorp may be deemed to be acceptable."  (*Id.* at 184.013.)

Similarly, Article 11.1 of the CivPol subcontract provides that

WWNS, as the subcontractor:

> shall be paid for performance hereunder in
> accordance with the terms of payment of this
> Subcontract, upon submission of proper invoices and
> Buyer approval.  The payment terms are Net 45 days
> from (a) Buyer receipt of Subcontractor invoice and
> (b) delivery of acceptable services . . . .

(Pl's Trial Ex. 186.012.)  Article 11.6 provides that

"[d]iscrepancies in invoices may result in a delay of payment

pending resolution of [the] discrepancy(s).  (*Id.* at 186.013.)

There is no doubt that the WPPS subcontract requires DynCorp to

review invoices remitted for payment within five days and that

failure to do so results in the invoice being deemed accepted for

payment.  To the extend that DynCorp's arguments involve unpaid

invoices submitted under the WPPS subcontract, the arguments are without merit.

Although Article 11.6 of the CivPol subcontract does not contain the same five day limitation on processing invoices remitted for payment, it does contemplate delays induced by discrepancies in submitted invoices.  DynCorp's CivPol support manager, Jasbir Gill testified that DynCorp employs a three-step approval process for invoices.  (Trial Tr. 229:23-230:4, May 1, 2008.)  First, her department reviews invoices to ensure that the proper purchase order number was identified, that the invoice was consistent with the purchase order, that the amount remitted for payment was not in excess of the amount authorized, and that supporting documentation was provided.  (*Id.* at 228:24-229:4.)  Ms. Gill then transmits the invoice to the in-country managers for confirmation that the goods were received and operational and that the service was rendered.  (*Id.* at 229:5-10.)  If approved by the in-country manager, the invoice is processed for payment.  If a discrepancy arises, WWNS was to be notified of the discrepancy.  (*Id.* at 229:13-22.)  In other words, if a discrepancy was discovered during the review process, DynCorp, by their own admission, was to reject the invoice for payment and notify WWNS of the rejection and the underlying reason for the rejection.  DynCorp failed to adhere to its own approval process when it failed to reject or approve the certain unpaid CivPol invoices within a reasonable time, and DynCorp offered no explanation for why, if it was dissatisfied with the goods and/or

-48-

services WWNS provided, it did not reject the submitted invoices for non-conformance and provide WWNS with an opportunity to cure.

As the Court noted in its Order denying DynCorp's Motion for Reconsideration of this issue, an eighteen month delay in determining whether WWNS delivered acceptable goods and services is unreasonable under the terms of the subcontract, which does not provide for an indefinite review period.  Moreover, an eighteen month delay in processing the invoices is unreasonable given DynCorp's own internal review process.  Further, the Court notes that DynCorp paid WWNS over $3.3 million dollars in February 2008 for outstanding invoices.  For these reasons, the Court finds that its Order granting the Plaintiffs's Renewed Motion for Judgment as a Matter of Law with respect to certain unpaid invoices still pending review is not a clear error of law and does not result in manifest injustice.  Accordingly, DynCorp's Motion to Alter or Amend the Court's Order granting the Plaintiffs' Renewed Motion for Judgment as a Matter of Law with respect to certain unpaid invoices still pending review is denied.

####    4.    Motion to Vacate or Remit Punitive Damage Award

The Court denies DynCorp's motion to vacate or remit the punitive damages award because the record demonstrates that DynCorp's conduct towards WWNS was malicious and the single-digit ratio between the compensatory award and the punitive award is within the constitutional limits of due process.

As a threshold matter, DynCorp contends that the Court should vacate or remit the jury's punitive damages award because of the fundamental unfairness the Court's refusal to give a jury instruction based on the Fourth Circuit's holding in *Hill* caused to permeate the trial proceedings.  For the reasons previously stated by the Court, the Court denies DynCorp's motion to vacate or to remit the punitive damages award on this ground.

DynCorp raises three issues regarding the verdict form that it asserts may only be resolved by either vacating the jury's ten million dollar punitive damages award or significantly remitting the amount.  First, DynCorp argues that the jury's punitive damages award should be remitted to $350,000 in accordance with Virginia's statutory cap[9] because the verdict form did not provide for an award of punitive damages by count, whereby rendering it virtually impossible to discern how much of the jury's ten million dollar award was related to the Virginia tortious interference with contract claim.  Second, DynCorp argues that the failure to allocate punitive damages separately on the verdict form also renders the ten million dollar award not reasonably proportional to the compensatory award for the Virginia tortious interference with contract claim. Third, DynCorp contends that the jury's punitive damage award must be vacated because the verdict form impermissibly allowed the jury

---

[9]*See* Virginia Code § 8.01-38.1 (providing that "[i]n no event shall the total amount awarded for punitive damages exceed $350,000.").

to award WWNS FZCO punitive damages based upon the Section 1981 claim.   These arguments are without merit.

First, as discussed above, the Court determined that the parties' proposed special verdict forms were excessive in their questioning of the jury.   Consequently, the Court prepared a general verdict form to be submitted to the jury.   However, the Court provided the parties ample opportunity to review a draft of the Court's proposed general verdict form and invited counsel to make revisions.   Counsel accepted the Court's invitation and suggested revisions to the breach of contract counts, as well as the questions regarding pre-judgment interest.   The Court implemented the parties' suggested revisions *in toto* and provided the parties with an opportunity to review the final draft of the verdict form before it was sent back to the jury.   At no time during that process, or at any other time, either on or off the record, orally or in writing, did DynCorp raise the issue regarding the punitive damages question or WWNS FZCO's inclusion as a party on all counts and counterclaims and the questions regarding prejudgment interest and punitive damages.   The Court will not entertain a motion to vacate or significantly remit a jury's award of punitive damages on the basis of the verdict form when no corresponding objections were raised at trial.

Moreover, the jury's verdict itself demonstrates that the punitive damages award was based on the Section 1981 claim - not the Virginia tortious interference with contract claim.   The jury

-51-

awarded $3.42 million dollars in compensatory damages for the Section 1981 claim, but only $83,000 for the Virginia tortious interference with contract claim.  Although the jury awarded prejudgment interest on the Section 1981 compensatory award, the jury affirmatively chose not to award prejudgment interest on the Virginia tortious interference with contract claim.  By virtue of the disparity between these compensatory awards, it is clear that the jury considered DynCorp's discriminatory conduct much more harmful that its tortious conduct and thus worthy of punitive damages.  Indeed, the award of prejudgment interest only on the Section 1981 claim illustrates the jury's belief that DynCorp should be punished for its discriminatory conduct.  It is therefore of no consequence that the verdict form did not provide for punitive damages to be awarded separately by count.

Even if the jury awarded punitive damages to punish DynCorp for both its discriminatory and tortious conduct, the fifty-fifty apportionment DynCorp assumes is nonsensical.  The disparity between the compensatory awards establishes that the jury did not view DynCorp's discriminatory and tortious conduct as having equal ramifications.  The ratio between the two compensatory awards is 41:1 ($3.42 million:$83,000).  Based on this ratio, the allocation between the Section 1981 claim and the Virginia tortious interference with contract claim is $9,756,098.00 for the Section 1981 claim and $243,902 for the Virginia tort claim, a sum significantly less than Virginia's statutory cap. This allocation

results in a constitutionally permissible 3:1 single digit ratio of
compensatory to punitive damages.

        Finally, the Court notes, as it did above, that the Court
granted WWNS's Motion to Join Worldwide Network Services
International, FZCO without any limitation on the scope of WWNS
FZCO's joinder.  (*See* Order granting Motion for Joinder, 1:07cv627
Doc. No. 223, March 13, 2008.)  DynCorp did not object to the
Court's Order at that time.  Nor did it ask for clarification of
WWNS FZCO's role in this action at any time before filing its post-
trial motion.  DynCorp did file a Motion to Dismiss WWNS FZCO from
this action on the eve of trial, but did not seek to clarify or
otherwise limit WWNS FZCO's role in this action at that time and
DynCorp did not argue that WWNS FZCO was not a real party in
interest.  It is incredulous that DynCorp would now, after being
presented with ample opportunity between March 13, 2008, and the
submission of its post-trial motion, complain about the inclusion of
WWNS FZCO as a plaintiff in this action for claims other than the
tortious interference with contract claim.  The Court will not
consider vacating or remitting the punitive damage award on this
ground.  That said, it is well established that a jury is presumed
to follow the instructions of a court.  *Weeks v. Angelone*, 528 U.S.
225, 234 (2000); *Stamathis v. Flying J., Inc.*, 389 F.3d 429, 442
(4th Cir. 2004).  Jury Instruction 10, proffered by DynCorp, places
the burden of proving discrimination solely on WWNS.  Jury

Instruction BB clearly distinguishes between WWNS and WWNS FZCO for purposes of awarding punitive damages, stating that the jury may

> award punitive damages if WWNS and WWNS FZCO have shown by clear and convincing evidence that DynCorp, maliciously or with reckless indifference discriminated against WWNS, and/or that DynCorp tortiously interfered with the contracts between WWNS FZCO and its employees, and/or conspired with EDO Corporation to interfere with the contracts between WWNS FZCO and its employees, and/or that DynCorp tortiously interfered with WWNS's prospective economic advantages.

(Jury Instruction No. BB, 1:07cv627 Doc. No. 395 Supp. 1, May 7, 2008.)  There can be no doubt, despite the verdict form identifying WWNS FZCO as a party in interest, that WWNS bore the burden of proving any compensatory or punitive damages awarded under the Section 1981 claim and that the jury assessed the compensatory and punitive damages awarded based on the evidence WWNS's set forth at trial.  DynCorp's Motion to Vacate or Remit the punitive damage award for errors contained in the verdict form is denied.

Having concluded that the jury awarded WWNS ten million dollars in punitive damages for DynCorp's Section 1981 violation, the Court turns to DynCorp's assertion that the punitive damage award is against the clear weight of the evidence.  "[A]n action pursuant to section 1981 entitles the plaintiff to 'both equitable and legal relief, including compensatory, and under certain circumstances, punitive damages.'"  *Stephens v. South Atlantic Canners, Inc.*, 848 F.2d 484, 489 (4th Cir. 1988) (quoting *Johnson v. Railway Express Agency*, 421 U.S. 454, 460 (1975)).  "[N]ot every

action under section 1981 warrants an award of punitive damages"
however.  *Id.* (citing *Beauford v. Sisters of Mercy-Province of
Detroit, Inc.*, 816 F.2d 1104, 1109 (6th Cir. 1987)).  Punitive
damages are only recoverable for conduct exhibiting malice, an evil
motive, or recklessness or callous indifference to a federally
protected right.  *Id.* (citing *Smith v. Wade*, 461 U.S. 30, 56
(1983)).

A court's inquiry does not cease upon a finding that a punitive
damages award is warranted under Section 1981.  To the extent a
punitive damages award is grossly excessive, it furthers no
legitimate purpose and constitutes an arbitrary deprivation of
property in violation of Due Process.  *State Farm Mut. Auto. Ins.
Co. v. Campbell*, 538 U.S. 408, 417-188 (2003).  To ensure that a
punitive damages award is constitutionally permissible, the Supreme
Court has instructed courts reviewing a jury's award of punitive
damages to consider three guideposts: (1) the degree of
reprehensibility of the defendant's misconduct; (2) the disparity
between the actual or potential harm suffered by the plaintiff and
the punitive damages award; and (3) the difference between the
punitive damages awarded by the jury and the civil penalties
authorized or imposed in comparable cases.  *Id.* at 418 (citing *BMW
of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

DynCorp contends that the ten million dollar punitive damages
award is against the clear weight of the evidence because WWNS's
performance under the CivPol subcontract placed DynCorp's

relationship with the State Department, its largest and most important customer, in jeopardy, and; therefore, it had sound business reasons for terminating its relationship with WWNS. DynCorp further asserts that there is no evidence of any pattern of mistreatment of minority-owned subcontractors that would support an award of punitive damages.

DynCorp ignores the jury's verdict, which establishes that the jury rejected DynCorp's evidence of poor performance and found that DynCorp maliciously discriminated against WWNS. The jury was instructed that it may award WWNS punitive damages if WWNS, by clear and convincing evidence, proved that DynCorp "maliciously or with reckless indifference discriminated against WWNS." (Jury Instruction No. BB, 1:07cv627 Doc. No. 395 Supp. 1, May 7, 2008.) As the Court previously noted, a jury is presumed to follow the Court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Stamathis v. Flying J., Inc.*, 389 F.3d 429, 442 (4th Cir. 2004). Thus, in awarding WWNS ten million dollars in punitive damages, the Court must presume that the jury found WWNS had satisfied its burden of proving DynCorp's discriminatory conduct was malicious in nature. In reviewing the evidence presented to the jury, the Court concludes that the totality of the evidence supports the jury's verdict because it demonstrates that DynCorp's intentional misconduct was malicious.

DynCorp's malicious intent towards WWNS is illustrated in DynCorp's conduct during the time period leading up to and after it

decided to terminate its relationship with WWNS. For example, WWNS introduced evidence at trial that Richard Walsh reached out to EDO Corporation well before DynCorp notified WWNS of its decision to terminate their contractual relationship. Mr. Walsh hired EDO Corporation to evaluate WWNS's workmanship with the Codan Radios. Mr. Walsh terminated EDO Corporation's contract because assessments of the Codan Radio system had already been completed by another firm. However, Mr. Walsh indicated in an e-mail to EDO Corporation that he would look for ways to work with EDO Corporation in the future. (Pl.'s Trial Ex. 483.). Less than one month later, and before notifying WWNS of the impending contract termination, Mr. Walsh contacted EDO Corporation and requested that the company begin planning to take over the Codan Radio network. (Pl.'s Trial Ex. 290.) Shortly thereafter, Mr. Walsh and a representative from EDO Corporation met with WWNS employee Rufus Dawkins. At the meeting Mr. Dawkins provided Mr. Walsh and EDO Corporation with a list of WWNS employees he recommended DynCorp and EDO hire. Mr. Dawkins also provided resumes and confidential salary information to DynCorp via e-mail to DynCorp employee Chad Dickey. Moreover, Leon DeBeer and Ken Kaufman held a meeting in Iraq July 26, 2006, at which they notified WWNS personnel that WWNS' subcontract would be terminated August 11, 2006, and that as of July 26, 2006, all WWNS employees should report to DynCorp via Mr. DeBeer. (Pl.'s Trial Ex. 34-35.) DynCorp later recanted its statement, informing WWNS employees that they continued to be considered WWNS employees. (Trial Tr. 131:15-

-57-

133:15, April 29, 2008.)  DynCorp's commitment to work with EDO Corporation and to assist EDO Corporation in taking over the Codan Radio network by enlisting the aid of a WWNS employee to solicit WWNS's in-country employees and by informing WWNS employees that they worked for DynCorp demonstrates DynCorp's intent to not only cease working with WWNS, but to destroy WWNS's ability to continue to operate in Iraq and Afghanistan.

DynCorp's intent to destroy WWNS's ability to continue operating in Iraq and Afghanistan is further illustrated by Mr. Walsh's directive to stop processing WWNS's invoices and to withhold payment on invoices already processed.  Without employees or revenue WWNS, was effectively shut down.

Beyond DynCorp's solicitation of WWNS' employees and refusal to remit payment for goods and services DynCorp accepted from WWNS, DynCorp's treatment of WWNS also demonstrates its malicious intent towards WWNS.  DynCorp employees failed to respond to e-mail requests by WWNS's employees, and failed to provide WWNS with the security badges required to move about Iraq.  Further, DynCorp failed to include WWNS at important planning meetings.  These deliberate actions hindered WWNS' ability to perform its obligations under the subcontract.  Moreover, DynCorp security personnel pointed a gun at Mr. Charles Jones and confiscated his personal belongings in a hotel room in Baghdad, and nothing in the record indicates that Mr. Jones provoked DynCorp or otherwise presented a security threat.

Most significantly, DynCorp's malicious intent towards WWNS
manifested itself at the October 2006 company dinner in Tyson's
Corner, Virginia.  There, Mr. Walsh was presented with a t-shirt
that stated, "I Took Down WWNS and All I Got was This Lousy T-
Shirt."  Mr. Walsh wore the t-shirt for the remainder of the
evening, during which a letter purporting to be from WWNS President
Walter Gray was read aloud in Ebonics.  Not only does this event
exhibit DynCorp's intent to destroy WWNS, but it convey's the racial
animus DynCorp harbored against WWNS.  No matter how poorly a
subcontractor performed on a government contract, or any contract
for that matter, the subcontractor's termination would not be
accompanied by a celebration that the termination of the subcontract
destroyed the subcontractor.  The Court therefore rejects DynCorp's
assertion that the jury's punitive damage award is against the clear
weight of the evidence and finds that the evidence demonstrates that
DynCorp acted with malice in terminating its relationship with WWNS.
Thus, a punitive damages award in this case is warranted, and the
only question that remains is whether the ten million dollar award
is excessive.  Upon consideration of the three guideposts first
articulated in *Gore*, the Court concludes that the jury's ten million
dollar punitive damages award is not excessive.

The first guidepost the Court must consider is the degree of
reprehensibility of DynCorp's misconduct.  *See State Farm Mut. Auto.*
*Ins. Co.*, 538 U.S. at 418.  In determining the degree of
reprehensibility of a defendant's conduct, the Supreme Court has

instructed courts to consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.  *Id.* at 419.

As discussed above, DynCorp's conduct in terminating its relationship with WWNS was malicious.  DynCorp's malicious discrimination manifested itself on multiple occasions, including when Mr. DeBeer convened a meeting of WWNS's personnel in Baghdad and informed them that they now worked for DynCorp; when DynCorp security personnel aimed a gun at Mr. Charles Jones and confiscated his personal property; when Mr. Richard Walsh issued a directive that DynCorp would not pay WWNS's remaining invoices; and when a DynCorp employee presented Mr. Walsh with a t-shirt at a company dinner that said, "I took down WWNS - and all I got was this lousy t-shirt," and read him a letter in Ebonics purporting to be from Walter Gray.  Moreover, DynCorp was aware that WWNS was financially vulnerable - WWNS's two subcontracts with DynCorp represented 95 percent of WWNS's business.  Thus, the Court finds that DynCorp's conduct towards WWNS has a high degree of reprehensibility.

The second guidepost the Court must consider is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award.  The Supreme Court has cautioned that

-60-

single-digit multipliers between compensatory damages and punitive
damages awards are more likely to comport with due process, but has
noted that a punitive award of more than four times the amount of
compensatory damages might be close to the line of constitutional
impropriety. *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425
(*citing Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-23 (1991);
*Gore*, 517 U.S. at 581). "When compensatory damages are substantial,
[however,] then a lesser ratio, perhaps only equal to compensatory
damages, can reach the outermost limit of the due process
guarantee." *Id.* Here, the jury awarded WWNS $3.42 million dollars
in compensatory damages for the Section 1981 claim. Setting aside
the jury's additional $83,000.00 compensatory award for the tortious
interference with contract claim, the ratio between the jury's
compensatory award and the punitive award is 3:1. A single-digit
ratio of 3:1 between a compensatory damages award and a punitive
damages award is well within the constitutionally accepted range.
Further, the Court finds that a compensatory award of $3.42 million
dollar is not so substantial as to reduce the constitutional line of
impropriety to a 1:1 ratio.

The final guidepost the Court must consider is the difference
between the punitive damages awarded by the jury and the civil
penalties authorized or imposed in comparable cases. Neither
DynCorp nor WWNS address this guidepost in their pleadings. Given
that Section 1981 does not limit the amount of damages a jury may

-61-

award a plaintiff for discrimination in contracting, this guidepost
is of little relevance to the Court's analysis.

From the foregoing, the Court denies DynCorp's motion to vacate
or remit the jury's ten million dollar punitive damages award
because the record demonstrates that DynCorp's conduct toward WWNS
was malicious and the single-digit ratio of 3:1 between the
compensatory award and the punitive award is within the
constitutional limits of due process.

### III.   CONCLUSION

In summary, the Court denies Defendant DynCorp International,
LLC's Renewed Motion for Judgment as a Matter of Law, Motion to
Alter or Amend Judgment, and Motion for a New Trial for the reasons
that follow.  First, the Court denies DynCorp's Renewed Motion for
Judgment as a Matter of Law on the Section 1981 claim because,
irregardless of the application of *Hill v. Lockheed Martin Logistics
Mgmt., Inc.*, 354 F.3d 277 (4th Cir. 2004), the evidence presented at
trial created a question of fact for the jury and a reasonable jury
could, after weighing the evidence produced by both parties, reject
DynCorp's evidence that Mr. Cashon was the sole decisionmaker and
that his decision to terminate DynCorp's contractual relationship
with WWNS was based on WWNS's poor performance as mendacity, and
infer from the believed falsehood that DynCorp's rationale was
nothing more than mere pretext for its intentional discrimination.
Second, the Court denies DynCorp's Renewed Motion for Judgment as a
Matter of Law on the tortious interference with contract claim

-62-

because evidence exists in the record upon which a reasonable jury could return a verdict in favor of WWNS and WWNS FZCO.  Third, the Court denies DynCorp's Motion for a New Trial with respect to its claim that the Court erroneously refused to give a jury instruction based on the holding in *Hill* because DynCorp has not demonstrated that *Hill* was a correct statement of law in Section 1981 cases, that imputation of an employee's racial animus to DynCorp was not covered by another instruction, or that the Court's refusal seriously impaired DynCorp's ability to conduct a defense.  Fourth, the Court denies DynCorp's Motion for a New Trial with respect to its assertion that the Court erroneously admitted certain testimony regarding the racial animus on non-decisionmakers at DynCorp because the Court did not error in refusing to give a jury instruction based on the holding in *Hill*.  Fifth, the Court denies DynCorp's Motion for a New Trial based on the Court's exclusion of the testimony of Messrs. Kellogg and Merriman and the two reports authored by Mr. Kellogg because Messrs. Kellogg and Merriman were undisclosed expert witnesses whose testimony was cumulative, and the reports constitute expert evidence, improperly designated, which contain hearsay. Sixth, the Court denies DynCorp's Motion for a New Trial with respect to its claim that the Court erroneously excluded evidence of WWNS's document destruction because the destroyed evidence was immaterial.  Seventh, the Court denies DynCorp's Motion for a New Trial with respect to its contention that the Court erred in preparing a verdict form that allowed the jury to award damages to

-63-

WWNS FZCO on claims other than tortious interference with contract because DynCorp failed to raise this issue during trial and no such limitation was placed on WWNS FZCO's joinder.  Eighth, the Court denies DynCorp's Motion to Alter or Amend the Court's Grant of Plaintiffs's Rule 50(a) motion regarding certain unpaid invoices because the subcontracts did not provide DynCorp with the right to withhold the processing of invoices remitted for payment indefinitely.  Finally, the Court denies DynCorp's motion to vacate or remit the ten million dollar punitive damages award because the record demonstrates that DynCorp's conduct towards WWNS was malicious and the single-digit ratio between the compensatory award and the punitive damages award is within the constitutional limits of due process.  Accordingly, it is hereby

ORDERED that Defendant DynCorp International, LLC's Renewed Motion for Judgment as a Matter of Law, Motion to Alter or Amend Judgment, and Motion for a New Trial [Doc. No. 427] is DENIED.


The Clerk is directed to forward a copy of this Order to counsel of record.

Entered this **22nd** day of September, 2008.


Alexandria, Virginia

09/**22**/08


Gerald Bruce Lee
United States District Judge

-64-